**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

AMANDA L. S.,

            Plaintiff,

   v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

           Defendant.

Case No. 21 C 5775

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Amanda L. S. seeks to reverse the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income ("SSI"). The Acting Commissioner moves for summary judgment seeking an order affirming the ALJ's decision. For the reasons stated below, the ALJ's decision is affirmed.

## BACKGROUND

Amanda protectively filed for SSI on January 4, 2019, alleging disability since August 1, 2018 due to bipolar disorder. Born in 1985, Amanda was 32 years old as of her alleged disability onset date. Amanda was diagnosed with bipolar disorder in 2008 or 2009 and has had several previous psychiatric hospitalizations. She also has a history of substance abuse. At the hearing, Amanda testified that she was taking Zyprexa and Depakote and currently compliant with her medications. Amanda completed two years of college as well as special training as a beautician. She has previously worked as a cashier, gas station attendant, dancer, and waitress and was last employed in 2018.

On February 22, 2021, the administrative law judge ("ALJ") issued a decision denying Amanda's application. (R. 13-24). The ALJ concluded that Amanda's depressive/bipolar disorder

and anxiety disorder were severe impairments but did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 15-17. The ALJ specifically considered Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). *Id*. Under the "paragraph B" analysis, the ALJ found that Amanda had a moderate limitation in the four functional areas of understanding, remembering or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. *Id*. at 16.

The ALJ then determined that Amanda had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations: (1) she is not able to climb ladders, ropes or scaffolds; (2) limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, or working at unprotected heights and she should avoid concentrated exposure to unguarded hazardous machinery; (3) limited to simple, routine tasks involving no more than simple decision-making, no more than occasional and minor changes in the work setting and work requiring the exercise of only simple judgment; (4) no work requiring multitasking; (5) able to perform work requiring an average production pace but she is incapable of significantly above average or highly variable production pace work; (6) no work that requires significant self-direction; (7) precluded from work involving direct public service, in person or over the phone, although she is able to tolerate brief and superficial interaction with the public, which is incidental to her primary job duties; (8) not able to work in crowded, hectic environments; and (9) can tolerate brief and superficial interaction with co-workers and supervisors as is common in unskilled work but she is not to perform teamwork or tandem tasks. *Id*. at 17-23. The ALJ found that Amanda did not have any past relevant work. *Id*. at 23. Based on the vocational expert's testimony, the ALJ concluded that Amanda was not

disabled because she can perform jobs existing in significant numbers in the national economy, including bench assembler and electronics worker. *Id*. at 29-32. The Appeals Council denied Amanda's request for review on August 31, 2021. *Id*. at 1-6.

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 416.920(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 416.920(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quotation marks omitted).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, --- U.S. ----, 139 S.Ct. 1148, 1154 (2019) (quotation marks omitted). In reviewing an

ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (quotation marks omitted). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

In support of her request for reversal and remand, Amanda raises two arguments. Amanda first challenges the RFC determination based on the ALJ's evaluation of her subjective symptoms. Second, she contends that the ALJ erred in failing to identify and resolve apparent conflicts between the Dictionary of Occupational Titles ("DOT") and the vocational expert's testimony. The Court addresses each argument in turn and concludes that more than a mere scintilla of evidence supports the ALJ's subjective symptom evaluation and the ALJ did not err by relying on the VE's testimony.

### A.      Subjective Symptom Assessment

Amanda contends that the ALJ erred in his assessment of the intensity, persistence, and limiting effects of her subjective symptoms. In evaluating subjective allegations, an ALJ assesses the objective medical evidence and a number of other factors, including the claimant's daily activities, effectiveness and side effects of any medication, treatment, other methods to alleviate symptoms, and factors that precipitate and aggravate symptoms. SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017); 20 C.F.R. § 416.929(c). "As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022); *Ray v. Saul*, 861 F. App'x 102, 107 (7th Cir. 2021) ("Patently wrong is a high threshold—'only when the ALJ's determination lacks any explanation or support ... will [we] declare it to be 'patently wrong' and deserving of reversal.'") (citations omitted).

Here, the ALJ concluded that Amanda's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 18). The ALJ found that the record as a whole, including the findings of the state agency psychologists, the conclusions of the consultative psychological examiner, the mental status examination findings, Amanda's response to treatment and medication despite some noncompliance, reported medication side effects, and her daily activities, failed to support that her functioning was as limited by her mental impairments as she alleged. *Id*. at 18-23.

Amanda challenges the ALJ's adverse subjective symptom assessment on several grounds, but none of her arguments show a reversible error by the ALJ. Amanda first contends that the ALJ erred by discounting her subjective allegations on the bases that she had a boyfriend, cared for a newborn, and performed household chores. Regarding Amanda's ability to interact with others, the ALJ acknowledged that Amanda reported problems getting along with others because she is not a people person and she testified that she feels anxious around people. (R. 16, 18, 42, 259-60, 311-12). The ALJ also noted that Amanda's mom reported that Amanda has a hard time getting along with others and she does not want to attend family events. *Id*. at 18, 53, 273, 325. Nevertheless, the ALJ concluded that Amanda had only moderate difficulties in interacting with others and limited Amanda to simple, routine tasks with only brief, superficial contact with others. *Id*. at 16, 17, 22-23. Specifically, the ALJ found that despite her anxiety around others, Amanda has a boyfriend, spends time with her mother, enjoys going out to eat, and shops weekly at the grocery store. *Id*. at 16, 22. The ALJ further noted that examinations were positive for mood deficits at times, but Amanda also demonstrated appropriate behavior and was described as cooperative and polite on examinations with providers, was engaged during treatment, and her ability to relate was adequate at a consultative examination. *Id*. at 16, 19-21. Amanda contends

the ALJ failed to explain how "the mere existence of a boyfriend at times cancel[s] out th[e] pile of clinical signs and symptoms." Doc. 18 at 11. But the ALJ did not say that the fact that Amanda has a boyfriend cancelled out her positive clinical findings. Rather, his decision said that Amanda's ability to maintain a relationship with her boyfriend, along with other evidence, did not support her allegations of disabling social limitations.

The ALJ also weighed the medical opinions regarding Amanda's mental health and social limitations, and Amanda does not challenge the ALJ's weighing of the opinion evidence. *See* 20 C.F.R. § 416.929(c)(1); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("discrepancies between the objective evidence and self-reports may suggest symptom exaggeration."). In particular, the ALJ relied on the state agency psychologists' opinions which found that Amanda is moderately limited in her ability to interact with the general public due to mood fluctuations but she retains the capacity to perform more than simple tasks but less than complex duties, with limited sustained contact with the public. (R. 75-76, 93-94); *Flener v. Flener*, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for the ALJ to rely on the opinions of . . . psychologists who are also experts in social security disability evaluation."). In addition, the ALJ considered the consultative examining psychologist's finding that Amanda's ability to relate during the examination was adequate and her ability to relate to others, including fellow workers, supervisors, and the general public, is fair. (R. 16, 21, 765). And finally, the ALJ's determination is more limited than Amanda's treating advanced practice nurse ("APN") Brenda Reilly's opinion in this regard. APN Reilly found that Amanda had no limitations in interacting with others, but ALJ found Reilly's opinion less persuasive citing Amanda's mood deficits. *Id.* at 21, 880. Based on this evidence, the ALJ reasonably discounted Amanda's claims that she is not able to function around people because she feels nervous and anxious.

Amanda next asserts that her ability to care for a newborn and perform household chores does not mean that she can work full-time. In assessing a claimant's statements about the extent of her symptoms, an ALJ may not "equat[e] activities of daily living with an ability to work." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). "But it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of [her] impairments was credible or exaggerated." *Prill v. Kijakazi*, 23 F.4th 738, 748 (7th Cir. 2022); 20 C.F.R. § 416.929(c)(3)(i).

Amanda testified that she lived with her boyfriend and seven-month-old son and she does all of the household chores, including laundry, mopping and sweeping floors, cooking, washing dishes, caring for her son, taking care of his room, and folding and putting away his clothes. (R. 46-48). Amanda indicated that she cared for her son independently during the day because her boyfriend was at work and her mother could not help because she is disabled. *Id*. at 45. Amanda also testified that she follows recipes and likes to cook tacos, barbecued chicken, steak, and pork chops. *Id*. at 48. She stated she "know[s] how to cook it all." *Id*. The ALJ acknowledged Amanda's report that she has problems paying attention for more than 10 minutes and she does not always finish tasks. *Id*. at 16. However, the ALJ discounted Amanda's statement that she feels overwhelmed and is unable to focus because it was inconsistent with the record showing that she is able to care for her seven-month-old child, follow a recipe, and perform household chores. *Id*. at 16, 22. In reaching this conclusion, the ALJ also noted that Amanda was able to post videos of herself on social media, watch videos for an hour or two at night, and drive. *Id*. at 16. The ALJ further considered that examinations showed that Amanda's memory and concentration were impaired at times but she was noted to be a good historian at the consultative exam and her memory was good as evidence by her ability to recite five digits forward/backward and recall three of three

words immediately and after a five-minute delay. *Id*. at 16, 764.  Regarding Amanda's ability to concentrate, the ALJ noted that during the consultative evaluation, Amanda was able to recite the months backwards, spell the word "world" backwards, name three large cities, and correctly perform simple and more complicated math problems. *Id*.  The Court finds no error in the ALJ's assessment of Amanda's daily activities.  The ALJ properly considered Amanda's description of her daily activities as one factor in determining that she had the capacity for simple, routine tasks.  Because the ALJ did not improperly equate Amanda's activities with an ability to work, the ALJ did not err in determining that Amanda's self-reported daily activities weighed against her account of disabling symptoms. *Burmester v. Berryhill*, 920 F.3d 507, 510-511 (7th Cir. 2019).

Amanda claims the ALJ failed to explain what he thought consultative examination findings that she could recall three of three words, recite the months backwards, and spell the word "world" backwards "might undermine." Doc. 18 at 12.  The Court disagrees.  The ALJ reviewed Amanda's and her mother's claims that she has difficulty remembering, concentrating, and focusing. (R. 16, 18).  However, he recounted these consultative examiner findings, among others, and explained that her overall memory and concentration were intact despite examinations showing her memory and concentration were impaired at times. *Id*. at 16, 22.  Reading the ALJ's decision as whole, this is sufficient to allow the Court to trace the ALJ's reasoning as to whether Amanda's allegations of disabling deficits with memory, concentration, and focus were supported by the objective medical evidence. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015) (ALJ "must adequately articulate her analysis so that [the court] can follow her reasoning.").

Amanda also contends that the ALJ failed to consider parts of the record that support the credibility of her symptoms.  She accuses the ALJ of ignoring that she was unable to care for her two daughters, needs reminders to take medication, and often needs her mother's help and

supervision to perform chores, care for her seven-month-old son, go to appointments, and obtain medical care. Doc. 18 at 12. An "ALJ doesn't need to address every piece of evidence, but he or she can't ignore a line of evidence supporting a finding of disability." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021). The ALJ did not ignore the evidence Amanda highlights. For example, the ALJ specifically cited to page 50 of Exhibit 16F, the portion of the record which indicates that Amanda's daughters ages 11 and 10 were taken care of by Amanda's mother. (R. 19, 841). Further, the ALJ explicitly noted a portion of that same progress note which indicated that Amanda "was not able to care for her two daughters." *Id*. at 19, 844. The ALJ expressly noted that Amanda needs reminders to attend appointments and take her medication. *Id*. at 16, 18, 22. In discounting Amanda's allegations of disabling symptoms, the ALJ also adequately discussed Amanda's ability to perform chores, care for her son, and go to appointments. The ALJ correctly considered that: (1) on a Function Report, Amanda noted she is able to prepare meals, clean her kitchen, wash laundry, vacuum, sweep, and shop in stores; (2) Amanda testified that she is able to drive and perform household chores; (3) she testified she prepares complete meals and cares for her seven-month-old son by herself during the day; and (4) Amanda's mother's statements that Amanda is able to perform household chores, does well with cooking, and is able to attend appointments and shop for groceries. *Id*. 16, 22, 45, 47-48, 257, 270-72, 309, 322-24. While Amanda believes that her need for medication reminders and mother's assistance means she would need to bring her mother to the workplace or that she would be unable to remember work tasks and remain on-task for acceptable limits, no treating, examining, or reviewing medical provider indicated Amanda needed such restrictions. Because the ALJ did not ignore a line of evidence contrary to his conclusion, the ALJ did not commit reversible error in finding Amanda's daily

activities inconsistent with the alleged intensity and severity of her symptoms, and the Court will not reweigh the evidence.

As part of his subjective symptom determination, the ALJ also noted that Amanda's treatment notes show some deficits in her mood at times, including manic episodes, psychosis, and delusions. (R. 22). But the ALJ correctly noted that during periods of medication compliance, her behavior was appropriate and she was noted to be polite and cooperative. *Id*. On this point, Amanda argues the ALJ erred by: (1) focusing only on periods of medication compliance and disregarding periods of noncompliance, (2) not considering the reasons for her not taking medication, including her lack of insight, her child-behavior, and her need for medication reminders, and (3) not addressing that during at least one hospitalization for mania, lab work confirmed that Amanda was compliant with her medication. Doc. 18 at 12-13. Again, the ALJ's decision belies Amanda's argument that the ALJ ignored an entire line of evidence. For instance, the ALJ specifically considered: (1) that Amanda was hospitalized in July 2019 despite testing showing that her Depakote level was in the therapeutic range (R. 19); (2) that Amanda was hospitalized in October 2018, February 2019, and August 2020 when noncompliant with medication (*id*. at 18, 19, 20); and (3) her poor and fair insight at times on examination (*id*. at 19-20) and need for medication reminders (*id*. at 16, 18, 22). Amanda also argues that the fact that she was psychiatrically hospitalized on one occasion despite medication compliance "highlights the factual and logical error of the ALJ's claim [] that [her] behavior was appropriate and she was noted to be polite/cooperative during periods of compliance." Doc. 21 at 4. But this one example of hospitalization despite medication compliance gives the Court no reason to think the ALJ's determination was not supported by substantial evidence given the other evidence of record. *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021) ("the presence of contradictory evidence and

arguments does not mean the ALJ's determination is not supported by substantial evidence."). The remainder of the record shows that on four occasions in October 2018, January 2019, February 2019, and August 2020, Amanda required hospitalizations due to increased symptoms from noncompliance with medication.

Amanda seems to fault the ALJ for failing to consider her mental limitations in determining whether she had an acceptable reasons for any noncompliance. Doc. 18 at 12-13. Amanda's argument is misplaced. The ALJ did not discount the severity of the mental health symptoms reported by Amanda on the basis of her medication noncompliance. Rather, the ALJ properly considered the effectiveness of medication she has taken to alleviate her symptoms. 20 C.F.R. § 416.929(c)(3)(iv); SSR 16-3p, 2017 WL 5180304, at *6 (ALJs should consider "any treatment and its success or failure"). In this regard, the ALJ concluded that Amanda's mental health functioning improved with medication compliance. As noted by the ALJ, the record supports this finding. (R. 18) (noting during hospitalization prior to her application date that "[a]fter her medication was restarted, her manic symptoms improved and she was noted to be calm/cooperative," "in better contact with reality," "her delusions were clearing," and "[t]here was no deficit in her memory and her judgment was intact."); *id*. at 18-19, 635 (psychiatric medications were restarted during January 2019 hospitalization and after adjustment of medications and therapeutic milieu, her symptoms improved); *id*. at 19 (noting she was not taking her psychotropic medication when hospitalized in February 2019 but her symptoms gradually improved when medication was restarted and at time of discharge, she was doing well with no symptoms of mania, psychosis or hallucinations); *id*. (in October 2019, [s]he stated she remembered to take her medication because she did not want to end up in the hospital again."); *id*. at 20 (noting in January 2020, "[s]he stated her emotional liability increased and she felt worse when she forgot to take her Risperdal."); *id*.

(noting in August 2020, Amanda had a recurrence of manic and depressive symptoms after she stopped taking her medication and was hospitalization but after restarting her medications, her mood stabilized and she was discharged in stable condition); *id.* (in September 2020, at a medication management evaluation, Amanda stated that her mood was okay after being restarted on her medication).

Once again, this is not a case where the ALJ ignored an entire line of contrary evidence. In essence, Amanda argues that the ALJ did not weigh this evidence regarding periods of noncompliance as she prefers, but this is not a basis for remand. *Gedatus*, 994 F.3d at 901 ("Despite her colorable arguments, we will not reweigh the evidence."); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). Moreover, the ALJ's weighing of the evidence is supported by the findings of the state agency psychologists and consultative examiner that Amanda maintained fair ability in regard to work-related activities and was able to handle work with restrictions despite her symptoms and periods of noncompliance. (R. 21-22, 69-76, 87-93,765).

Amanda points out that individuals with mental impairments should be expected to have good days and bad days. This is true, but the ALJ was entitled to consider the objective medical evidence as well as Amanda's treatment history, presentation at appointments, medication effectiveness, and daily activities in assessing her statements regarding the extent of her symptoms and functioning. 20 C.F.R. § 416.939(c)(2), (3). Moreover, the ALJ did not ignore that Amanda's mental health symptoms waxed and waned. Instead, the ALJ considered Amanda's manic episodes, need for hospitalization, and positive findings on examination at times and credited her to a degree by determining that she had severe mental impairments and needed numerous restrictions to work. There is no error because the ALJ's subjective symptom analysis is supported by more than a mere scintilla of evidence. The Court will not substitute its judgment for that of

the ALJ's. *Grotts*, 27 F.4th at 1279 ("When Grotts criticizes the ALJ's analysis of her daily functioning, her good and bad days, and her pain, she is, as above, inviting us to reweigh the evidence.").

Finally, Amanda challenges the ALJ's analysis of her medication side effects and reported fatigue. Amanda asserts that the ALJ misrepresented the record when finding that "she generally denied any medication side effects and there was no evidence she reported any significant fatigue or tiredness before October 2020." (R. 22). Amanda identifies three instances where she identified medication side effects and fatigue before October 2020. First, in her March 2019 Function Report, Amanda wrote that the side effect of Depakote was "tired all the time." *Id*. at 262. Second, in her November 2019 Function Report, Amanda stated that she slept "at least 18 hours a day" and that the side effect of Depakote was "sleepiness." *Id*. at 308, 314. Third, a July 2020 provider note indicates that Amanda reported sleeping 17 hours a day. *Id*. at 902.

At the outset, the Court notes that Amanda's attorney stated at the February 2021 hearing that "the fatigue and the tiredness from medication, that's documented starting in October of last year." (R. 50). He added: "I don't see anything from the doctor that indicates it's because of her medications." *Id*. at 49. In any event and as the ALJ noted, treatment records from December 30, 2019, April 13, 2020, and September 8, 2020 indicate that Amanda denied any side effects from her medications and in December 2020, she denied sleep problems. *Id*. at 22 (citing *id*. at 884, 892, 954, 999). These reports to her doctors undermine her claim of excessive daytime sleeping and fatigue due to her medication. The ALJ nonetheless acknowledged that in the Function Reports Amanda cites, she stated that "she wants to sleep all the time because her medication makes her tired" and her mother said "she takes long naps during the day due to fatigue." *Id*. at 18; *see also id*. at 22 (noting that Amanda "testified that she wanted to sleep all the time due to her

medication"). The ALJ further noted that at an August 2019 psychiatric evaluation, Amanda reported sleeping too much. *Id.* at 19, 841. But, at the hearing, Amanda also testified that she prepares meals, performs household chores, and cares for her seven-month-old child by herself during the day. So, Amanda's testimony does not document that she slept 17-18 hours a day in February 2021. In the end, the record reveals that Amanda gave varying accounts of her medication side effects, and "[i]t was the ALJ's responsibility to decide the facts and resolve discrepancies in these accounts." *Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020). When the record allows for more than one interpretation or "where reasonable minds could differ as to the perception of the evidence, the court defers to the ALJ's view, not the plaintiff's." *Javier G. v. Kijakazi*, 2023 WL 2587812, at *5 (N.D. Ill. Mar. 21, 2023). Here, the ALJ's resolution has adequate support in Amanda's denials of medication side effects to her providers and her hearing testimony regarding her daily activities. While Amanda is correct that the ALJ's finding did not capture her July 2020 provider note reporting excessive sleeping, this inaccuracy by the ALJ does not render his overall subjective symptom analysis "patently wrong." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (upholding ALJ's credibility assessment even though "ALJ stated that there was no evidence surgery was ever recommended, [but there was] a discussion of surgery in notes from a visit to a neurosurgeon in June 2008"). Moreover, the ALJ did not find that Amanda did not report any medication side effects. Rather, he concluded that Amanda "generally" (but not always) denied any medication side effects and he partially accommodated her statements by restricting her to work with no climbing and work around hazards. (R. 22-23).

Amanda next argues the ALJ failed to properly accommodate her medication side effects and fatigue because "[i]t would be mathematically impossible to sustain an eight-hour workday and five-day workweek or equivalent schedule while sleeping 18 hours a day, and the inability to

work that extensively would render [her] disabled." Doc. 18 at 13. The ALJ did not improperly accommodate Amanda's possible medication side effects when evaluating her ability to work. The ALJ considered Amanda's and her mother's accounts of her medication side effects. (R.18). But "these are just allegations, and allegations are not enough." *Javier G.*, 2023 WL 2587812, at *4 (citing SSR 16-3p, 2017 WL 5180304, at *2); *Grotts*, 27 F.4th at 1278. ("Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence."). "It is the plaintiff's burden to prove he or she is disabled by providing medical evidence beyond mere claims." *Javier G.*, 2023 WL 2587812, at *4. The ALJ reasonably found that Amanda's medication side effect symptoms were not as severe and limiting as she alleged. Nonetheless, the ALJ acknowledged that Amanda "does experience some limitations but not to the extent alleged." (R. 23). For this reason, due to "possible medication side effects" and complaints of fatigue, the ALJ limited Amanda to avoiding climbing and working around hazards. *Id*. at 23. Amanda insists that this is "illogical and is not bolstered by any logical bridge" because "how could prohibiting climbing and hazardous possibly accommodate someone who is tired and sleeping so extensively." Doc. 18 at 13. But in making this argument, Amanda ignores the ALJ's finding that she was not a limited as she alleged and no medical provider found that Amanda's medications required her to sleep 17-18 hours per day. The state agency reviewing psychologists considered Amanda's and her mother's reports regarding the side effects of her medications, but they did not impose functional restrictions related to extreme sleep or fatigue. *Id*. at 71-72, 74-76, 88-90, 92-93. The ALJ found the opinions of the state agency reviewing psychologists persuasive, and the ALJ adopted the additional limitations of avoiding climbing and workplace hazards due to potential medication side effects and her fatigue. *Id*. at 22, 23; *Burmester*, 920 F.3d at 510 (RFC finding that is "more limiting than that of any state agency .

. . psychologist, illustrat[es] reasoned consideration given to the evidence [claimant] presented."). Moreover, the consultative examiner found that Amanda had fair abilities in regard to work-activities despite her reported symptoms and use of medication. (R. 763, 765). Finally, when Amanda's own provider was asked to describe "any side effects of medication that may have implications for working, e.g. drowsiness, dizziness, nausea, etc.," APN Reilly stated only that "[d]ue to pregnancy, she is currently just using Risperdal" and she did not list any medication side effects. *Id*. at 879. Given this record, the ALJ's decision to reject Amanda's complaints of disabling medication side-effects and fatigue was not patently wrong.

In sum, the ALJ did not err in weighing the objective medical record, Amanda's treatment and efficacy, activities of daily living, and medication side effects, and then concluding that these factors undermined the severity and limitations of her claimed symptoms.

**B.     Alleged Conflict between the VE's Testimony and the DOT**

Amanda contends the ALJ erred at step five because the RFC assessment conflicts with the two jobs he found Amanda capable of performing. Specifically, Amanda argues that the ALJ's RFC finding that she is incapable of operating moving machinery is inconsistent with her ability to perform the jobs of bench assembler and electronics worker. The Commissioner argues that the ALJ's determination that Amanda could perform the bench assembler and electronics worker jobs is supported by the testimony of the VE and the DOT. The Commissioner is correct.

At step five of the process for evaluating disability, the ALJ determines whether a claimant unable to do past relevant work can do any other work based on her RFC and vocational factors, such as age, education, and work experience. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). The Commissioner bears the burden at the fifth step and must present evidence demonstrating that a claimant can perform work existing in significant numbers in the national

economy. *Id*. To determine whether the Commissioner has met her burden the ALJ primarily relies on the DOT. *Id*. The ALJ may also use a VE to supplement the information provided in the DOT. *Id*. If "evidence from a VE 'appears to conflict with the DOT,' SSR 00-4p requires further inquiry: an ALJ must obtain 'a reasonable explanation for the apparent conflict.'" *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (quoting SSR 00-4p). A conflict is apparent if it is "so obvious that the ALJ should have picked up on [it] without any assistance." *Weatherbee*, 649 F.3d at 570 (quoting *Overman*, 546 F.3d at 463). The ALJ must resolve any apparent conflicts even if the claimant's counsel did not raise the issue at the administrative level. *Overman*, 546 F.3d at 463; *Weatherbee*, 649 F.3d at 570 ("Ruling 00-4p requires ALJs to investigate and resolve any apparent conflict between the VE's testimony and the DOT."); *see also Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (where the VE's testimony appears to conflict with the DOT, "a claimant's failure to object during a hearing cannot excuse an ALJ's failure to" obtain a reasonable explanation for the apparent conflict).

At the hearing, the ALJ questioned the vocational expert ("VE") regarding potential jobs that a hypothetical individual with an RFC matching Amanda's could perform. (R. 56-60). The VE testified that an individual with such an RFC could perform the representative jobs of bench assembler (DOT 706.684-042) and electronics worker (DOT 726.687-010). *Id*. at 60. The ALJ asked the VE to identify any conflict between his testimony and the DOT. *Id*. at 56. The VE did not identify any such conflict during his testimony. *Id*. at 60-61. Amanda's attorney did not ask the VE whether the bench assembler and electronics worker jobs involve "operating moving machinery." *Id*. at 61. In his decision, the ALJ found that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." *Id*. at 23.

Amanda did not identify any purported conflicts between the VE's testimony and the DOT during the hearing. As a result, she must now demonstrate that "the conflicts were obvious enough that the ALJ should have picked up on them without any assistance." *Surprise v. Saul*, 968 F.3d 658, 663 (7th Cir. 2020) (quoting *Overman*, 546 F.3d at 463). Amanda fails to make such a showing. Amanda contends that there is an inconsistency between her RFC limitation that she should be "limited to working in non-hazardous environments, i.e., no . . . operating moving machinery" and the ALJ's finding that she can perform the jobs described in the DOT as bench assembler and electronics worker. She believes the jobs of bench assembler and electronics worker require use of moving machinery. Regarding the bench assembler job, Amanda contends the position requires use of "handtools and power tools," a "pneumatic impact wrench," a "power press," a "pneumatic clinching gun," and a "rivet press," and thus could not be performed by an individual like herself, who is precluded from "operating moving machinery." (R. 17). Amanda also contends that that the representative occupation of electronics worker is incompatible with an RFC that limits her to not "operating moving machinery" because it entails use of "handtools," "power tools and equipment," a "transfer press," "electro-etch printing devices," and "heating equipment." Amanda argues there was an obvious conflict between a limitation to not operating moving machinery and such job requirements. Thus, according to Amanda, the VE's testimony was in conflict with the DOT and the ALJ failed to inquire about and reconcile these conflicts.

In response, the Commissioner argues that Amanda has failed to show the references to various tools and equipment in the bench assembler and electronics worker job descriptions constitute operating moving machinery. The Commissioner disputes that there is any conflict between the VE's testimony and the DOT because the DOT indicates that neither job identified by

the VE involves exposure to "moving mechanical parts," let alone operating moving machinery. Thus, the Commissioner asserts that the VE's testimony is consistent with the DOT.

Here, no apparent conflict exists between the VE's testimony that Amanda could perform the jobs of bench assembler and electronics worker and the DOT. In his RFC determination, the ALJ explained that "[d]ue to possible medication side effects and her subjective complaints of fatigue, [Amanda] must [] avoid . . . work around hazards." (R. 23). The ALJ then limited Amanda in part "to working in non-hazardous environments, i.e., no . . . operating moving machinery." *Id.* at 17. Social Security Ruling 96-9p describes hazards as *"moving mechanical parts of equipment, tools, or machinery*; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals."* SSR 96-9P, 1996 WL 374185, at *9 (July 2, 1996) (emphasis added). The DOT does not define the use of the tools and equipment in question as a hazard. Rather, the DOT expressly states that the hazard of "Moving Mech. Parts" is "Not Present" in the bench assembler and electronics worker positions, meaning the "[a]ctivity or condition does not exist." DOT 706.684-042, 1991 WL 679055; DOT 726.687-010, 1991 WL 679633. While the bench assembler and electronics worker jobs involve the use of some tools and equipment, the DOT has classified such tools and equipment as not involving work with moving mechanical parts of machinery, and therefore, these jobs do not require operating moving machinery and are not in excess of Amanda's RFC.

Moreover, Amanda has identified no authority concluding that use of the tools and equipment in question is inconsistent with an RFC precluding operating moving machinery where the DOT definitions state that the hazard of moving mechanical parts is not present. Rather, courts have found that there is no conflict with an RFC limitation to avoid moving machinery and the DOT when the job description provides that "moving mechanical parts" are "not present" in the

position. *See Carter v. Kijakazi*, 2021 WL 4931724, at *6 (S.D.W. Va. Sept. 30, 2021), report and recommendation adopted, 2021 WL 4928011 (S.D.W. Va. Oct. 21, 2021) (finding no apparent conflict where the RFC included a restriction to no "hazards such as moving machinery" but the DOT specifically provides that the job of nut and bolt assembler does not present hazards involving moving mechanical parts despite references to using machinery in the job description); *Maxwell v. Saul*, 2019 WL 3546837, at *5 (E.D. Ca. Aug. 5, 2019), aff'd 840 F. App'x 896 (9th Cir. 2020) (holding no inconsistency between RFC providing plaintiff should not be exposed to hazards such as "moving machinery" and dishwasher and laundry worker jobs where the DOT provided that hazard of moving mechanical parts was not present in either occupation); *Stover v. Berryhill*, 2019 WL 2895023, at *10 (S.D.W. Va. June 6, 2019), report and recommendation, 2019 WL 2881543 (S.D.W. Va. July 3, 2019) (holding no error where plaintiff argued that the "assembler" job requires the use of machines, such as an arbor press, punch press, tap spot welding or riveters and the RFC specifically provided that plaintiff was to avoid moving machinery, but the DOT also provided that "moving mechanical parts" were "not present" in this position); *White v. Colvin*, 2018 WL 6537150, *4 n.4 (M.D. Pa. Nov. 21, 2018), report and recommendation adopted, 2018 WL 6531652 (M.D. Pa. Dec. 12, 2018) (RFC required plaintiff to "avoid all moving mechanical parts on all moving machinery" and the name of the carding machine operator occupation identified by the VE "suggest[ed] it would require some exposure to moving machinery," but noting DOT explains that this occupation involves no exposure to moving mechanical parts); *Spears v. Berryhill*, 2018 WL 707989, at *9-10 (C.D. Cal. Feb 5, 2018) (no conflict existed where plaintiff's RFC prohibited operation of "moving mechanical parts" and "moving machinery" but did not preclude use of machines altogether and job of proof-machine operator must necessarily operate machines, but the DOT makes clear that "moving" mechanical parts or machinery are not

involved in that process.); *Hensley v. Colvin*, 2016 WL 3964336, at *6 (E.D. Ky. July 21, 2016) (rejecting plaintiff's argument that jobs referenced by the VE required exposure to moving machinery contrary to the RFC limitation of avoiding all exposure to moving machinery where all six jobs identified by the VE required no exposure to moving mechanical parts per the DOT); *Wigmore v. Colvin*, 2013 WL 1900621, at *18 (D. Or. April 16, 2013), report and recommendation adopted, 2013 WL 1900617 (D. Or. May 7, 2013) ("The mere fact that [plaintiff's jobs] require the use of a machine does not render the VE's testimony inconsistent with the limitations in the hypothetical [precluding moving machinery], especially in light of the DOT descriptions which specifically exclude the use of 'moving mechanical parts.'"); *Morales v. Astrue*, 2011 WL 1671953, at *3 (C.D. Cal. May 4, 2011), aff'd, 504 F. App'x 592 (9th Cir. 2013) (RFC which precluded exposure to active hazards such as moving equipment did not conflict with hand packager job which starts, stops, and regulates the speed of a conveyor because the DOT description does not indicate any proximity to moving mechanical parts of equipment, tools, or machinery).

Accordingly, the Court finds no clear conflict existed between the VE's testimony that Amanda, who was precluded from "operating moving machinery," could perform the jobs of bench assembler and electronics worker and the DOT's listing of those jobs as not requiring exposure to "moving mechanical parts." Put another way, the VE's assessment that the jobs of bench assembler and electronics worker did not require operating moving machinery does not obviously contradict the DOT's descriptions. As a result, any potential conflict between the VE's testimony and the DOT was not so apparent that the ALJ should have picked up on it without any assistance. As such, the ALJ did not err by relying on the VE's testimony, and there is substantial evidence

supporting his finding that there are a significant number of jobs in the national economy that Amanda could perform.[1]

## CONCLUSION

For the reasons stated above, Plaintiff's request for reversal and remand [18] is denied and the Commissioner's Motion for Summary Judgment [19] is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is affirmed.

**SO ORDERED.**

Dated: March 30, 2023

_____
Sunil R. Harjani
United States Magistrate Judge

---

[1] Further, even if the use of the tools or equipment at issue might constitute "operating moving machinery," the Court notes that nothing in the description for the electronics worker job states that use of the tools and equipment highlighted by Amanda is required to perform the job. Rather, according to the DOT, an electronics worker performs "any combination" of the enumerated tasks, not all of which entail using the tools and equipment in question. *Rehana v. Berryhill*, 2017 WL 1166137, at *4 (E.D. Cal. Mar. 29, 2017); *Novoa v. Colvin*, 2014 WL 3854369, at *8 (C.D. Cal. Aug. 6, 2014); *Dumble v. Astrue*, 2011 WL 4502086, at *6 (C.D. Cal. Sept. 28, 2011); *Ballesteros v. Astrue*, 2011 WL 836656, at *4 (C.D. Cal. Mar. 8, 2011). For example, the DOT description states that an electronics worker "[p]rints identifying information on components and parts, using silk screen, transfer press, or electro-etch printing devices, *or* ink pad and stamp." DOT 726.687-010, 1991 WL 679633 (emphasis added). Thus, it is just as likely that the position would require the worker to use an ink pad and stamp in performing this task of the job. *Novoa*, 2014 WL 3854369, at *8. In addition, an electronics worker "[c]leans and deglosses parts, using cleaning devices, solutions, and abrasives. Trims flash from molded or cast parts, using cutting tool or file. Applies primers, plastics, adhesives, and other coatings to designated surfaces, using applicators, such as spray guns, brushes, or rollers. Fills shells, caps, cases, and other cavities with plastic encapsulating fluid or dips parts in fluid to protect, coat, and seal parts" and "[m]oves parts and finished components to designated areas of plant, such as assembly, shipping and receiving, or storage. Loads and unloads parts from ovens, baskets, pallets, and racks." DOT 726.687-010, 1991 WL 679633. Amanda's limitation to not operating moving machinery does not appear to preclude the performance of these tasks.